En el Tribunal Supremo de Puerto Rico

| Disidente Universal de Puerto Rico, Inc. | Apelación Administrativa |
|---|---|
| Demandante–Recurrido | |
| .V | 98TSPR68 |
| Departamento de Estado | |
| Demandado–Peticionario | |

Número del Caso: AC-97-0018

Abogados Parte Peticionaria: Lcdo. Carlos Lugo Fiol
Procurador General
Lcda. Miriam Alvarez Archilla
Procuradora General Auxiliar

Abogados Parte Recurrida: Lcdo. Guillermo González Alcazar

Agencia Administrativa – Departamento de Estado

Tribunal de circuito de Apelaciones: Circuito Regional I

Juez Ponente: Hon. Martínez Torres

Fecha: 6/12/1998

Materia: Revisión Administrativa

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

**EN EL TRIBUNAL SUPREMO DE PUERTO RICO**

Disidente Universal de P.R.,
Inc.

    Apelado-recurrente

                                 AC-97-18

        v.                                         Revisión
                                           Administrativa

Departamento de Estado

    Apelante-recurrido

Opinión del Tribunal emitida por el Juez Asociado señor Negrón García

San Juan, Puerto Rico, a 12 de junio de 1998

El 7 de diciembre de 1995, Angel W. Padilla Piña solicitó al Departamento de Estado **certifi-cación de prensa** para <u>Disidente Universal de P.R., Inc.</u>, organización periodística, sin fines de lucro, dedicada esencialmente a velar y denunciar las violaciones de Derechos Humanos en Cuba. Consignó que el periodismo no constituía su medio principal de vida. Por tal razón, a te-nor con la Sec. 2-408(e) de la **Ley de Vehículos y Tránsito de P.R.** y el **Reglamento Para Regir la Expedición, Renovación, Cancelación, Uso y Responsabilidades de las Certificaciones de Prensa**, se le denegó el beneficio de una **tablilla especial de prensa.**

Luego de pedir sin éxito reconsideración, impugnó la constitucionalidad de ambos preceptos. El 9 de diciembre de 1996, el Tribunal de Circuito de Apelaciones[1] (Hons. Amadeo Murga, Rodríguez García y Martínez Torres), los sostuvo. Sin embargo, en reconsideración, (Hons. Rossy García, Rodríguez García y Martínez Torres), decretó su inconstitucionalidad por requerir que el periodismo constituya el medio principal de vida. Dicho foro razonó que aunque no se violaba la libertad de prensa, la legislación y reglamentación "hacía[n] más difícil la labor del periodista". Bajo ese predicado, aplicó la norma de que el gobierno no puede negar un beneficio a una persona a base de un requisito que afecte un derecho fundamental, tal y como la libertad de prensa. Sostuvo que la legislación incide negativamente sobre el ejercicio de esa libertad y no basta que el interés gubernamental sea sustancial, sino que es menester que dicho interés no pueda alcanzarse por medios más amplios de lo necesario. Se negó a aplicar el escrutinio racional o mínimo y, en su lugar, usó un escrutinio intermedio. Concluyó que aunque el interés del Estado era sustancial, el medio para alcanzarlo -clasificar los periodistas a base de si derivan de su profesión su principal fuente de sustento- era innecesariamente amplio. Sugirió que el criterio establecido en la propia Ley y Reglamento, de dedicarse "de día a día" es

---

[1] El recurso, originalmente presentado en el Tribunal Superior, Sala de San Juan, fue trasladado al Tribunal de Circuito de Apelaciones conforme la enmienda a la Ley Núm. 248 de 25 de diciembre de 1995, Art. 9.004(a) del Plan de Reorganización Núm. 1 de la Rama Judicial.

suficiente para adelantar el interés del Estado, y que el requisito económico de "que constituya su principal medio de vida" adolece de amplitud excesiva.

En apelación, el Depto. de Estado cuestiona dicho dictamen.[2]

# I

Como **único** beneficio, la sección 2-408 de la Ley Núm. 11 del 3 de abril de 1987, enmendatoria de la Ley de Vehículos y Tránsito, autorizó **expedir esas tablillas especiales** a todo vehículo de motor que sea propiedad y utilice un miembro acreditado de la Prensa General Activa, o pertenezca a una agencia o empresa noticiosa para uso exclusivo de uno de sus miembros. Estas personas son

_____

[2] Plantea:

"1. Erró el Honorable Tribunal de Circuito al aplicar al caso de autos el escrutinio intermedio para establecer la validez constitucional de la clasificación sobre que el periodismo constituyera el "medio principal de vida" del solicitante de una credencial de prensa, cuando se trata de una reglamentación socio económica relativa al poder del Estado para reglamentar dicha profesión, cuyo escrutinio debió ser el del nexo racional o tradicional mínimo.

2. Erró el Honorable Tribunal de Circuito al declarar la inconstitucionalidad de la sección 2-048(e) de la Ley Núm. 141 de 20 de julio de 1960, según enmendada, 9 L.P.R.A. sec. 488(e), conocida como Ley de Vehículos y Tránsito y los Artículos IIA, IIIB y IVB del Reglamento para regir la expedición, renovación, cancelación, uso y responsabilidades de las Certificaciones de Prensa, Núm. 5285 de 3 de agosto de 1995.

3. Erró el Honorable Tribunal de Circuito al determinar que la sección 2-408(e), de la Ley 141 de 20 de julio de 1960, según enmendada, 9 L.P.R.A. sec. 488(e), conocida como Ley de Vehículos y Tránsito y su contraparte reglamentaria adolecen del defecto de

aquellas debidamente certificadas por el Depto. de Estado, dedicados a la búsqueda de información de **día a día** para los medios noticiosos del país y, para los cuales esta ocupación constituye el **medio principal de vida.**

El propósito de esta legislación es remedial y eminentemente socio-económico. Así quedó diáfanamente consignado, al señalarse en su **Exposición de Motivos** que "[l]os miembros de la Prensa General Activa de nuestro país [...] se quejan de que los agentes del orden público, al ver estacionados sus carros con la tablilla de prensa en la parte superior y la tablilla regular en la parte delantera del vehículo, les denuncian e imponen multas. Esta medida va encaminada a establecer una disposición **permitiendo el uso de la tablilla especial únicamente sin riesgo alguno de sufrir inconvenientes con los agentes del orden público.** Esto, además, logrará que se cumpla el objetivo principal de la Sección 2-408 de la Ley Núm. 141, el cual es **facultar a los periodistas que puedan llevar a cabo su misión de mantener bien informado al público y desempeñar la ocupación que constituye su medio principal de vida.**" (Énfasis nuestro).

Por su parte, el Art. III del aludido Reglamento provee que se expida una certificación de prensa a todo miembro de la "Prensa General Activa en Puerto Rico"[3] de 18

---

sobrextensión (overbreadth) o amplitud excesiva y que por ello son inconstitucionales."

[3]   Su Art. II define así **miembro de la Prensa General Activa**:

"Dueño, gerente general, directores, directores asociados, jefes de redacción, reporteros,

años o más. La solicitud debe acompañarse con una recomendación de la empresa o corporación periodística para la cual trabaja, que certificará que "es un miembro de la Prensa General Activa, que se desempeña en labores periodísticas o de información en forma directa y consistente para la empresa o corporación." Art. III A. Además, deberá consignar si dicho trabajo es su medio principal de vida.

Notamos pues, que el precepto legal y el reglamentario establecen que la certificación para obtener una tablilla especial de prensa, es para quienes se dediquen **de día a día a la búsqueda de información y para los cuales tal ocupación constituye su medio principal de vida.** Como corolario, quedan excluidos los que hacen periodismo esporádica o parcialmente, sin que constituya su principal medio de sustento.

Padilla Piña argumenta que negarle la certificación, sólo porque su trabajo periodístico no constituye su medio principal de vida, restringe y coarta su libertad de palabra y prensa. **No tiene razón.**

II

---

editores, fotoperiodistas y todo personal del Departamento de Noticias de una Empresa o Corporación periodística, registrada en el Departamento de Estado de Puerto Rico y que ejerza el periodismo escrito, radial o televisado en Puerto Rico, dedicado a la búsqueda, elaboración, edición o difusión de la noticia de interés general, que se desempeñe en sus labores en forma directa y consistente para dicha Empresa o Corporación y cuya prestación de servicios está certificada por la parte servida y para el cual esta ocupación constituye su **medio principal de vida.**"

El principio de igual protección de las leyes consagrado en el Art. II, Sec. 7 de nuestra Constitución prohibe el discrimen **injustificado**, **sin exigir trato igual** para todos los ciudadanos. Se activa ante legislación o acción gubernamental que clasifique grupos y discrimine **injustificadamente** unos frente a otros. Facultad para las Ciencias Sociales v. Consejo de Educación Superior, res. en 2 de junio de 1993; Calo v. Cartagena, res. en 28 de junio de 1991; Aulet Lebrón v. Depto. de Servicios Sociales, res. en 28 de junio de 1991; Mercado Vega v. U.P.R., 128 D.P.R. 273 (1991); Salas v. Municipio, 119 D.P.R. 625 (1987); M and B.S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319 (1987); Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984).

Para evaluar situaciones de ese género, los tribunales examinamos la razonabilidad de la clasificación, a base del escrutinio **estricto** o el de **nexo racional**. Rodríguez Pagán v. Depto. de Servicios Sociales, res. en 3 de febrero de 1993; Zachry International v. Tribunal Superior, 104 D.P.R. 267 (1975).

El primero (estricto), se emplea ante clasificaciones que afectan derechos fundamentales tales como el voto, la intimidad, el culto, la expresión y otros, o se trate de clasificaciones sospechosas, o sea, aquellas establecidas por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad. Rodríguez Rodríguez v. E.L.A., res. en 4 de junio de 1992. Su análisis presupone la inconstitucionalidad del estatuto y, por ende, el Estado tiene que probar que la clasificación responde a un interés apremiante y es necesaria, por

no existir un medio menos oneroso para promover y alcanzar dicho interés. San Miguel Lorenzana v. E.L.A., res. en 1ro. de noviembre de 1993; Calo v. Cartagena, supra.

En el otro extremo, el escrutinio de nexo racional o tradicional, se utiliza en clasificaciones de tipo socio-económico. La constitucionalidad se presume. Rodríguez Pagán v. Depto. de Servicios Sociales, supra. Quien impugna tiene que demostrar que la clasificación es arbitraria y no existe nexo racional entre ella y el interés legítimo del Estado. Vélez v. Srio. de Justicia, supra; M and B.S. Inc. v. Depto. de Agricultura, supra.[4]

### III

Nuestra Constitución y la federal sitúan[5] la libertad de prensa como derecho fundamental. Méndez Arocho v. El Vocero, res. en 30 de junio de 1993; El Vocero v. E.L.A., res. en 8 de julio de 1992; Rodríguez Rodríguez v. E.L.A., supra; Pueblo v. Arandes De Celis, 120 D.P.R. 530 (1988);

---

[4] En la jurisdicción federal se ha empleado un tercer escrutinio –el intermedio- cuando la clasificación afecta intereses individuales importantes, aunque no fundamenta-les, como los basados en sexo y extranjería. En Puerto Rico no lo hemos adoptado. Para clasificaciones de esa índole, utilizamos el escrutinio estricto. Almodóvar v. Méndez, 125 D.P.R. 218 (1990); León Rosario v. Torres, 109 D.P.R. 804 (1980).

[5] El Art. II Sec.4 de nuestra Constitución lee:

"No se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios."

La Primera Enmienda de la Constitución de los Estados Unidos reza:

"El Congreso no aprobará ninguna ley con respecto al establecimiento de religión alguna, o que prohiba el libre ejercicio de la misma o que coarte la libertad de palabra o de prensa; o el derecho del pueblo a reunirse pacíficamente y a solicitar del Gobierno la reparación de agravios."

Santiago v. Bolt, 117 D.P.R. 153 (1986); Soto v. Secretario de Justicia, 112 D.P.R. 477 (1982); Aponte Martínez v. Lugo, 100 D.P.R. 282 (1971). Su esencia estriba en impedir la restricción arbitraria **del contenido de publicaciones**, así como el medio, lugar y la manera que se realicen, no importa su veracidad, popularidad o simpatía.[6] Coss v. C.E.E., res. en 8 de febrero de 1995; Aponte Martínez v. Lugo, supra. "Si la garantía constitucional significa algo, es, al menos de ordinario, que 'el gobierno no tiene la facultad de restringir la expresión a base de su mensaje, ideas, objetivos o contenido'" Tribe, American Constitutional Law, second edition, 1988, pag. 790 (traducción nuestra, citas omitidas). Es la libertad de los periódicos para decidir lo que quieren imprimir y la protección al público de recibir la información tal y como es publicada. Implica además, el derecho del periodista a tener acceso a la información que desea publicar sin trabas innecesarias. Silva Iglecia v. Panel Sobre el Fiscal Especial Independiente, supra; Rivera González v. Danny's Bakery, 121 D.P.R. 304 (1988); Miami Herald v. Tornillo, 418 U.S. 241 (1974); Kleindienst v. Mandel, 408 U.S. 762 (1972); Branzburg v. Hayes, 408 U.S. 665 (1972). Resaltamos una vez más el valor trascendental del acceso a la información por su estrecha correspondencia con la libre expresión, pues "[s]in conocimiento de hechos no se puede juzgar; tampoco

---

[6] Virginia Pharmacy Board v. Virginia Consumer Council, 425 U.S. 748 (1976); Cohen v. California, 403 U.S. 15 (1971); Near v. Minnesota, 283 U.S. 697 (1931); Debs v. U.S., 249 U.S. 211(1919).

se puede exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales o a través del proceso de las urnas cada (4) años". <u>Soto</u> v. <u>Secretario de Justicia</u>, <u>supra</u>, pág. 485. <u>López Vives</u> v. <u>Policía de P.R.</u>, 118 D.P.R. 219 (1987). Nuestra sociedad democrática se nutre de corrientes liberales. Refrendamos la dimensión constitucional del derecho de acceso e información de la prensa y el público en general. Evitamos así que el gobierno maneje los asuntos públicos en secreto y disminuya el flujo constante de información al público en menoscabo de la participación en asuntos que le conciernen, <u>Soto</u> v. <u>Secretario</u>, <u>supra</u>, pág. 486. Sin embargo, también reconocemos que este valor de libertad de expresión "[n]o supone una irrestricción absoluta, [...] que [impida] subordinarse a otros intereses cuando la necesidad y conveniencia pública lo requieran". <u>Bonilla</u> v. <u>P.N.P.</u>, res. en 13 de marzo de 1996; <u>Velázquez</u> v. <u>Autoridad Metropolitana de Autobuses</u>, res. en 15 de septiembre de 1992.

IV

Con esta breve normativa en mente, precisemos el alcance de las disposiciones de ley y reglamento impugnadas. Es claro que la sola negativa de una certificación de prensa a Padilla Piña, <u>per se</u>, no le impide ni restringe su libertad de prensa. Publicar un periódico o tener acceso a la información no depende de que se expida tal certificación de prensa. **Su único efecto es no poseer el beneficio aludido de una tablilla especial**. El propósito de la Ley de Tránsito dista mucho de interferir con el contenido de la expresión o publicación; por el contrario, provee al sector

más dinámico y activo de la prensa un comprensible beneficio socioeconómico. Este trato particular a los miembros de la prensa que se dedican de día a día a la búsqueda de información y para quienes dicha profesión constituye su principal fuente de sustento, no infringe la garantía de libertad de prensa de los demás, pues no conlleva o representa peligro de suprimir determinada idea o expresión.

La legislación y reglamentación impugnada no están dirigidas contra determinado grupo o sector de la prensa. **Sus criterios en nada inciden sobre el tamaño o poder de la empresa periodística. Incluso los miembros de la prensa de pequeñas empresas están incluidas en el beneficio de la tablilla especial, siempre que se dediquen diariamente al periodismo y el mismo represente su principal fuente de sustento.** Tampoco obstaculiza su labor; por el contrario, la promueve y facilita para quienes han hecho del periodismo su principal medio de vida. Padilla Piña no ha demostrado (no existe indicio alguno), de que la misma interfiera con la libertad de prensa de <u>Disidente Universal de P.R., Inc.</u>, pues no la penaliza por sus ideas o expresiones. Tampoco regula contenido alguno ni constituye censura previa de sus publicaciones. El derecho a la tablilla **especial**, previa la certificación requerida, no es fundamental ni exige aplicar el escrutinio estricto. Como concluyó en reconsideración el Tribunal de Circuito de Apelaciones, el requisito impugnado "no restringe directamente la libertad de expresión y prensa. No prohibe ni reglamenta la expresión o publicación de ideas". Bajo los

parámetros constitucionales pertinentes, sólo el trato arbitrario e injustificado, que constituya una carga para el periodista, viola la cláusula de libertad de prensa, mas no aquel trato que persigue beneficiar al mayor número de personas posibles.

Bajo el escrutinio mínimo o de nexo racional, ante una legislación de este tipo, esencialmente socioeconómica, debemos gran deferencia al legislador cuando se utiliza como punta de lanza la cláusula de igual protección de las leyes para impugnarlas. Marina Ind. Inc. v. Brown Boveri Corp., 114 D.P.R. 64 (1983). No nos corresponde enjuiciar su sabiduría. Olazagasti v. Eastern Sugar Associate, 79 D.P.R. 93(1956); Cervecería Corona v. Srio. Obras Públicas, 97 D.P.R. 44(1968). De existir una razón valedera que relacione la clasificación con el interés del Estado, sostendremos su validez.

En la situación de autos, no hay duda de que la Asamblea Legislativa tuvo la intención de beneficiar al periodista que se dedica diariamente a la búsqueda de la información como medio principal de vida. Su propósito primordial fue librarlo de los inconvenientes cotidianos generados por la policía en el área del tránsito vehicular.

Promover y facilitar la labor a la prensa y demás medios de difusión diaria es un interés importante y sustancial del Estado. Tomamos conocimiento judicial de que los estacionamientos facilitados por las agencias de gobierno para la prensa son limitados y, aún aquellos que ostentan la tablilla especial, muchas veces no logran ni tienen acceso garantizado. De exigirse la entrega de la

tablilla especial de prensa a todo aquel que reclame ser periodista –incluso los que ocasionalmente escriben un artículo en algún periódico o intervienen de alguna forma en la difusión o análisis de información a través de la radio o la televisión–, sobrecargaría los escasos y limitados espacios de estacionamiento en el país y, a la postre afectaría detrimentalmente la prensa diaria. No hay duda que el limitar la concesión de Certificaciones de Prensa y tablillas especiales es un medio que razonablemente promueve ese interés identificado. La clasificación pues, está relacionada razonablemente a dicho interés.

VI

Finalmente, no nos convence el fundamento del Tribunal de Circuito sobre amplitud excesiva.

La **doctrina de amplitud excesiva** se desarrolló como técnica de análisis judicial para asegurar que la **libertad de expresión** goce la máxima protección, debido a su importancia constitucional. Al igual que la **doctrina de vaguedad**, se utiliza para examinar la constitucionalidad de una ley de su faz, **no en su aplicación**. Son excepciones a las normas de legitimación activa (standing), que permiten determinar si la ley afectaría derechos de terceras personas que no se encuentran ante el tribunal. Ambas doctrinas presuponen que hay un ejercicio del derecho a la libre expresión que no podría ser legítimamente restringido por reglamentación gubernamental. U.N.T.S v. Soler Zapata, res en 16 de abril de 1993.

Si de su faz la ley es excesivamente amplia, se considera si existen medios menos onerosos para alcanzar el propósito gubernamental. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, 1988, vol. II, págs. 1319-1320. 1987).[7]

En Pueblo v. Hernández Colón, 118 D.P.R. 891,899 (1987), resolvimos que para invalidar un estatuto, la amplitud excesiva tenía que ser sustancial en relación con

---

[7] Es excesivamente amplio un estatuto que además de controlar o regular actividades constitucionalmente regulables, también afecta e invade el ámbito de expresiones o conductas protegidas. Gunther, Constitutional Law, Twelfth Edition, 1991. NAACP v. Alabama, 357 U.S. 449 (1964); Thornhill v. Alabama, 310 U.S. 88(1940). Sin embargo, "plausiblemente puede impugnarse una ley, alegando nulidad debido a excesiva amplitud, sólo cuando: (1) la actividad protegida constituye una parte significativa del objetivo de la ley, y (2) no existe una manera satisfactoria de separar las aplicaciones constitucionales de la ley de sus aplicaciones inconstitucionales, de forma que se puedan suprimir estas últimas, claramente y en un solo paso, del alcance de la ley." Tribe, Ob. Cit., pág. 1022. Además, "[e]n el análisis sobre la amplitud excesiva está implícita la idea de que no debe anularse una ley de su faz a menos que ésta impida sustancialmente la celebración de actividades protegidas [...] Por lo tanto, un estatuto redactado de manera restrictiva para que refleje la relación íntima existente entre los medios seleccionados por la legislatura y los fines permisibles del gobierno no es vulnerable de su faz simplemente porque alguien pudiera imaginar aplicaciones ocasionales que trascienden los límites constitucionales." Tribe, Ob. Cit., págs. 1024-1025. "La existencia de un efecto disuasivo incluso en el campo de los derechos protegidos por la Primera Enmienda nunca se ha considerado como fundamento suficiente, en sí y por sí, para prohibir la acción estatal". Younger v. Harris, 401 U.S. 37,51 (1971). (Traducción nuestra).

En Broadrick v. Oklahoma, 413 U.S. 601 (1973), se dijo que las invalidaciones por amplitud excesiva, fueron generalmente inapropiadas cuando la alegada aplicación impermisible de la ley impugnada, afectaba conducta más que expresión. Desde entonces, el Tribunal Supremo Federal ha indicado que la doctrina permanece disponible en ciertas circunstancias, especialmente en la impugnación de regulaciones de expresión, más que de conducta. Schad v. M.T. Ephraim, 452 U.S. 61 (1981); Schaumburg v. Citizens for Better Environ, 444 U.S. 620 (1980); Erznoznik v. Jacksonville, 422 U.S. 205 (1975). En otros contextos, se han rechazado varios ataques por amplitud excesiva, reiterándose Broadrick. N.Y. v. Feber, 458 U.S. 747

el alcance legítimo que la medida puede tener, y "si no están afectados derechos de libertad de expresión y asociación constitucionalmente protegidos, **no procede examinar la ambigüedad de una reglamentación**." (Enfasis suplido).

En el caso de autos, repetimos, el propósito principal de la legislación no es regular o controlar la libertad de prensa. Su efecto sobre ese derecho, si alguno, **es incidental**, igual al que de ordinario tiene toda concesión de algún privilegio sobre las personas excluidas. En su análisis constitucional, no se justifica aplicar el escrutinio intermedio; mucho menos anular esta legislación por alegada amplitud excesiva. Este tipo de legislación no exige al Estado utilizar el medio menos oneroso para alcanzar su interés; basta que esté razonablemente relacionado con la clasificación.

Se dictará sentencia revocatoria.


ANTONIO S. NEGRON GARCÍA
Juez Asociado

---

(1982); Parker v. Levy, 417 U.S. 733 (1974); Arnnett v. Kennedy, 416 U.S. 134 (1974).

**EN EL TRIBUNAL SUPREMO DE PUERTO RICO**

Disidente Universal de P.R.,
Inc.

    Apelado-recurrente

                          AC-97-18       Revisión
                                             Administrativa

      v.

Departamento de Estado

    Apelante-recurrido

SENTENCIA

San Juan, Puerto Rico, a 12 de junio de 1998

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente, se revoca la Sentencia del Tribunal de Circuito de Apelaciones dictada en reconsideración el 19 de marzo de 1997.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Hernández Denton emitió Opinión Disidente a la cual se une la Juez Asociada señora Naveira de Rodón. El Juez Asociado señor Corrada del Río se inhibió.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Disidente Universal de
Puerto Rico, Inc.

    Peticionaria-Recurrente

      Vs.                  AC-97-18        Certiorari

Departamento de Estado del
Gobierno de Puerto Rico

    Recurrido

Opinión Disidente emitida por el Juez Asociado señor Hernández Denton a la cual se une la Juez Asociada señora Naveira de Rodón

San Juan, Puerto Rico, a 12 de junio de 1998.

Por considerar que el Departamento de Estado, no tiene autoridad para expedir credenciales de prensa que se utilicen como identificación, y que al hacerlo y adoptar como criterio para su expedición el concepto de Prensa General Activa de la Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm. 141 del 20 de julio de 1960, según enmendada, se ha excedido de la autoridad delegada, disentimos.

I

Angel Padilla Piña, Director del periódico *Disidente* solicitó en el Departamento de Estado una credencial de periodista. La empresa periodística que publica *Disidente* es Disidente Universal de

Puerto Rico, Inc., una corporación sin fines de lucro, dedicada a denunciar las violaciones de derechos humanos en Cuba. Acompañó con su solicitud una carta firmada por la secretaria de la corporación, en la que se hizo constar que Padilla Piña es el director del periódico y que "entre sus funciones está cubrir eventos locales e internacionales relacionados con las violaciones de los Derechos Humanos en Cuba."

A tenor con lo dispuesto en el Reglamento para Regir la Expedición, Renovación, Cancelación, Uso y Responsabilidades de la Certificaciones de Prensa, Reglamento Núm. 5285 del 3 de agosto de 1995, el Departamento de Estado denegó dicha certificación ya que el periodismo no constituía su medio principal de vida. El Sr. Padilla Piña solicitó, sin éxito, reconsideración ante el Departamento de Estado.

Acudió al Tribunal de Circuito de Apelaciones a impugnar la constitucionalidad de dicho Reglamento y de la Sección 2-408(e) de la Ley de Vehículos y Tránsito. Inicialmente el Tribunal de Circuito de Apelaciones, Circuito Regional I de San Juan, confirmó el dictamen administrativo. Sin embargo, en reconsideración decretó la inconstitucionalidad de los preceptos impugnados.

Dicho foro apelativo concluyó que ambas disposiciones eran inconstitucionales de su faz. Señaló que "en efecto la referida certificación y en particular la tarjeta de identificación tipo "clip-on" que expide el Departamento de Estado, es en muchas ocasiones lo único que permite a un periodista entrar a una conferencia de prensa o un área restringida al público en general". Inconforme, el Procurador General recurre ante nos.

La Opinión de este Tribunal revoca al foro apelativo y concluye que tanto la sección 2-408(e) de la Ley de Vehículos y Tránsito como el Reglamento 5285 del Departamento de Estado se sostienen constitucionalmente por tratarse de una legislación remedial y eminentemente socioeconómica, **cuyo único beneficio** es expedir una tablilla especial de prensa a los periodistas acreditados por dicha agencia gubernamental. Considera también que el efecto de estas

disposiciones sobre el derecho a la libertad de prensa, si alguno, es incidental.

Para lograr un análisis adecuado y completo de lo que verdaderamente está planteado en este caso es necesario distinguir entre la expedición de una credencial de prensa que **identifique** a su portador como miembro de la prensa de Puerto Rico y la expedición de una certificación cuyo propósito exclusivo sea habilitar a su portador para que obtenga el beneficio de una tablilla especial de prensa que le permitirá estacionarse en lugares reservados para uso exclusivo de la prensa.

Lo primero, la expedición de la credencial, afecta directamente la función medular de la prensa. No hay duda de que una credencial de prensa expedida por un organismo gubernamental, identificando a su portador como miembro de la prensa de Puerto Rico, facilita sustancialmente las labores del periodista al solicitar información y acceso a determinadas funciones y eventos del Estado, en los cuales usualmente se requiere que la prensa se identifique como tal. Además de facilitar su labor periodística le otorga una ventaja significativa sobre aquellos otros miembros de la prensa que no gozan de este endoso oficial.[8]

Lo segundo, el uso de una tablilla especial de prensa, no incide de modo directo en el acceso a funciones y eventos o en la labor de solicitar información. Sin embargo, no hay duda de que hace más cómoda la labor de recopilar información, aspecto esencial de su trabajo como periodista.

Aclarada la diferencia entre ambas conceptos, examinemos el derecho aplicable.

II

La decisión del Departamento de Estado se hizo al amparo del Reglamento para Regir la Expedición, Renovación, Cancelación, Uso y Responsabilidades de las Certificaciones de Prensa. Este Reglamento que

regula las certificaciones de prensa fue adoptado en virtud de la autoridad conferida por la Ley de Procedimiento Administrativo Uniforme, Ley 170 del 12 de agosto de 1988, capítulo II, Sección 3.1. y por la Sección 2-408 (e) de la Ley de Vehículos y Tránsito de Puerto Rico, Ley 141 de 20 de julio de 1960, según enmendada. Reglamento 5285, Artículo 1. Reglamentos del Estado Libre Asociado de Puerto Rico, sec. 201.

Examinadas estas leyes no encontramos autorización legislativa alguna para que el Departamento de Estado expida certificaciones de prensa que sirvan como credenciales. Las secciones de ley citadas como base legal por el propio Reglamento no tienen referencia alguna a credenciales de prensa.

La Sección 3.1 del Capítulo III de la Ley de Procedimiento Administrativo Uniforme dispone cuales serán los derechos a salvaguardarse en los procedimientos adjudicativos formales ante las agencias: notificación oportuna, derecho a presentar evidencia, derecho a una adjudicación imparcial y a que la decisión sea basada en el expediente.

La otra sección de ley citada como autoridad para el Reglamento es la sección 2-408(e) de la Ley Núm. 141 del 20 de julio de 1960, conocida como la Ley de Vehículos y Tránsito.[9] Esta ley autoriza al Secretario de Transportación y Obras Públicas a reglamentar todo lo concerniente al uso y expedición de las tablillas que identifican los vehículos de motor en Puerto Rico. La Ley Núm. 28 de 5 de mayo de 1976[10] enmendó la Ley 141 y le añadió la Sección 2-408, con el propósito de que el Secretario de Transportación y Obras Públicas pudiese autorizar el uso de una tablilla especial de prensa para los miembros de la Prensa General Activa. Dicha sección dispone:

---

[8] *Véase* nuestras expresiones en <u>Rafael Nadal Arcelay v. Departamento de Estado</u>, res. en 12 de junio de 1998, Opinión disidente del Juez Hernández Denton.
[9] En adelante Ley 141, según enmendada.
[10] 9 L.P.R.A. sec. 488(e).

(e) Para efectos de esta sección[11] la frase "miembros de la Prensa General Activa" significará aquellas personas debidamente certificadas por el Departamento de Estado que se dedican a la búsqueda de información de día a día para los medios noticiosos del país y para los cuales esta ocupación constituye su medio principal de vida.

Un examen de la disposición citada refleja que el requisito de ser miembro de la Prensa General Activa, y su consiguiente definición, es **para el propósito exclusivo** de obtener la tablilla especial de prensa. Se le requiere al solicitante que acuda al Departamento de Estado para que éste lo certifique como miembro de la Prensa General Activa. Para ello es necesario que cumpla con dos requisitos: debe dedicarse día a día a la búsqueda de información para los medios noticiosos del país, **y** el periodismo constituir su medio principal de vida. La expedición de una tablilla especial de prensa claramente es un beneficio concedido por el Estado para los miembros de la Prensa General Activa y está condicionado a que los solicitantes cumplan con los requisitos antes descritos.

Sin embargo, dicho estatuto no le otorgó poderes adicionales al Departamento de Estado para expedir certificaciones de prensa que se utilicen para **otros propósitos**. El Departamento tampoco tiene autoridad para utilizar los requisitos de la Ley de Vehículos y Tránsito como los criterios rectores para la expedición de una credencial de prensa. Nada hay en la letra de la Ley de Vehículos y Tránsito, ni en el historial de sus enmiendas[12], que refleje la intención, ni la autorización de la Asamblea Legislativa para que se extendiese a la expedición de las credenciales de prensa los criterios antes esbozados adoptados por las enmiendas a la Ley 141 para la expedición de las tablillas especiales de prensa.

---

[11] Entiéndase la expedición de tablillas especiales de prensa por el Secretario de Transportación y Obras Públicas a los miembros de la Prensa General Activa.

[12] *Véase* Informe de la Comisión de Transportación y Obras Públicas de la Cámara de Representantes del 20 de abril de 1976 sobre el P. de la C. 1832 para adicionar la Sección 2-408(e) a la Ley 141 de 20 de julio de 1960; Informe de la Comisión de Transportación y Obras Públicas de la Cámara de Representantes sobre el P. de la C. 228 para disponer el uso único de una tablilla especial de prensa; Informe de la Comisión de Transportación y Obras Públicas del Senado del 12 de mayo de 1986 sobre el P. de la C. 228 para disponer el uso de una tablilla única de prensa; Discusión del P. de la C. 228, Diario de Sesiones, marzo 12 de 1987, a la pág. 436; Exposición de Motivos de la Ley Núm. 11 de 3 de abril de 1987.

Sin embargo, una lectura completa y cuidadosa del Reglamento impugnado revela que éste expresamente reconoce que su propósito es dual. El Artículo 1 dispone que el propósito del Reglamento es establecer las normas para expedir, renovar, cancelar, uso y responsabilidades que conlleva el uso de las certificaciones de prensa. Este documento "certifica que su poseedor es un miembro de la Prensa General Activa en Puerto Rico y que así fue certificado por la empresa o corporación para la cual trabaja."[13] **Además** establece un procedimiento para certificar a los "Miembros de la Prensa General Activa" para los efectos de solicitar una tablilla especial de prensa. Artículo 1 del Reglamento 5285, Reglamento del Estado Libre Asociado de Puerto Rico, sec. 201.

Es decir, según el Reglamento, el Departamento de Estado se ha tomado la prerrogativa de regular todo lo concerniente a las credenciales de prensa, además de establecer un procedimiento para certificar a aquellos periodistas que por pertenecer a la "Prensa General Activa" pueden solicitar la tablilla especial de prensa. Cabe recalcar que, según examinamos, la autorización legislativa es sólo para lo segundo.

Al examinar el Reglamento 5285 no queda duda de que la certificación de prensa expedida es *de facto* un carnet de identificación de prensa. El Artículo 3(I) del Reglamento 5285, Reglamentos del Estado Libre Asociado de Puerto Rico sec. 203 (I), dispone que el Departamento de Estado emitirá una **certificación laminada tipo *clip-on* para que el periodista la utilice en su vestimenta y sea visible cuando desempeña sus funciones en la calle.**

Del propio Reglamento se desprende el propósito de que dicha certificación sirva como identificación. El Artículo 4(A) del Reglamento 5285, Reglamentos del Estado Libre Asociado de Puerto Rico sec. 204(A), claramente dispone:

---

[13] Artículo 2(B) del Reglamento 5285, Reglamentos del Estado Libre Asociado de Puerto Rico se. 202(B).

El solicitante a quien se le expida una certificación de prensa podrá utilizarla tan sólo como certificación de que es un miembro de la Prensa General Activa dedicado a la búsqueda de información de día a día para un medio noticioso debidamente registrado y para el que dicha labor constituye su medio principal de vida. Esta certificación tan sólo servirá como método de identificación cuando su portador esté cubriendo eventos asignados por el medio noticioso para el cual labora y como certificación requerida por la Ley Núm. 141, Sección 2-408(e) [9 L.P.R.A. sec. 488(e)].

El Reglamento dispone que sólo podrán solicitar una certificación de prensa los mayores de 18 años que sean miembros de la Prensa General Activa, según definido el concepto en el propio Reglamento. Reglamento 5285, Artículo 3, Reglamentos del Estado Libre Asociado de Puerto Rico, sec. 203. El Artículo 2(A) define el término "Miembro de la Prensa General Activa" como:

Dueño, gerente general, directores, directores asociados, jefes de redacción, reporteros, editores, fotoperiodistas y todo personal que realice trabajo periodístico y que forme parte del personal del Departamento de Noticias de una empresa o corporación periodística, registrada en el Departamento de Estado de Puerto Rico y que ejerza el periodismo escrito, radial o televisado en Puerto Rico, dedicado a la búsqueda, elaboración, edición o difusión de la noticia de interés general, que se desempeñe en sus labores en forma directa y consistente para dicha empresa o corporación y cuya prestación de servicios está certificada por la parte servida y para el cual esta ocupación constituye su medio principal de vida. Reglamentos del Estado Libre Asociado de Puerto Rico, sec. 202(A).

Es decir, a tenor con el Reglamento 5285, la condición de dedicarse día a día a la búsqueda de información para los medios noticiosos del país y de que el periodismo constituya el medio principal de vida del miembro de la prensa es un requisito tanto para la credencial como para la certificación que permite obtener la tablilla especial de prensa.

El Reglamento adopta el criterio de la Ley 141, según enmendada, **establecido para propósitos exclusivos de expedir tablillas especiales de prensa**, y lo incorpora y traspone a la función de expedir credenciales. Además, sin tener autorización legislativa para ello, se atribuye la función de expedir credenciales de prensa que sirven de identificación. Esta no fue la intención ni la autorización otorgada

por la Asamblea Legislativa al Departamento de Estado. Examinado desde esta perspectiva se desprende que el Reglamento 5285 se excedió de la autoridad delegada y resulta claramente *ultra vires.*

Nuestra doctrina y jurisprudencia, siguiendo los postulados del Tribunal Supremo de los Estados Unidos, ha reconocido la delegación del poder de reglamentar en las agencias y departamentos de la rama ejecutiva. Sin embargo, a pesar de reconocer la validez constitucional de estándares de delegación generales y amplios, hemos reiterado que un reglamento no puede excederse o extralimitarse de la delegación concedida. Un reglamento que se extralimita de lo autorizado por el mandato legislativo es nulo e insostenible. El proceso analítico a seguirse al examinar la validez de un reglamento requiere como punto de partida determinar si la actuación administrativa está autorizada por la ley habilitadora. Marketing and Brokerage Specialists Inc. v. Departamento de Agricultura, 118 D.P.R. 319, 326(1978); Carrero Gueits v. Departamento de Educación, Opinión del Tribunal de 30 de octubre de 1996, ___ D.P.R.___ (1996).

Nada hay en las leyes habilitadoras del Reglamento 5285 que autorice al Departamento de Estado a expedir credenciales de prensa que sirvan como medio de identificación, y mucho menos a hacer extensivo los criterios restrictivos diseñados para la expedición de tablillas especiales de prensa a la expedición de esas credenciales de prensa.

La situación es más grave aun si consideramos que se trata de un asunto que afecta las funciones medulares de la prensa. El Departamento de Estado se ha abrogado la facultad de identificar y definir quien es prensa en Puerto Rico. Al exigir que un miembro de la prensa cumpla con los requisitos de dedicarse día a día a la búsqueda de información y que éste sea su medio principal de vida como requisito de umbral para expedirle una credencial de prensa que le servirá como identificación al llevar a cabo sus labores periodísticas, restringe de manera peligrosa la definición de prensa en Puerto Rico e incide de un modo inaceptable en el derecho a la libertad de prensa reconocido en el Art.

II Sec. 4 de nuestra Constitución y en la Primera Enmienda de la Constitución de los Estados Unidos de América.

Nuestros pronunciamientos anteriores han adoptado una visión amplia y abarcadora del concepto "prensa". También hemos otorgado gran respeto y protección a la labor de la prensa:

> "Lo que se debe proteger no es la *institución* en sí, sino la labor de la prensa: viabilizar un vehículo de información y opinión, informar y educar al público, ofrecer críticas, proveer un foro para la discusión y el debate, y actuar como un sustituto para obtener noticias e información para sus lectores, que por sí y como individuos no pueden o no desean compilarla. Una garantía especial de la libertad de prensa deberá aplicar no solamente a aquellos que la corte podía clasificar como "prensa" sino a quienquiera, de cualquier tamaño, y cualquier medio, que regularmente asuma la misión de prensa". Oliveras v. Paniagua Diez, 115 D.P.R. 257, 268.[14]

Esta posición es cónsona con los pronunciamientos del Tribunal Supremo de los Estados Unidos:

> "[t]he liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets...the press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion" Lovell v. City of Griffin, 303 U.S. 444,452 (1938).

IV

Una vez determinado que el Reglamento 5282 es inválido por excederse de la autoridad delegada por la Asamblea Legislativa, nos corresponde analizar cuidadosamente la sección de la Ley de Vehículos y Tránsito que autoriza la expedición de unas tablillas especiales de prensa, para determinar si infringe alguna cláusula constitucional.

Somos de la opinión que la primacía de la libertad de expresión y prensa en nuestro ordenamiento constitucional, requiere un análisis más cuidadoso y exhaustivo, tanto de la situación de hechos presentada ante nos como del derecho aplicable, que la que lleva a cabo la Opinión de este Tribunal. Méndez Arocho v. El Vocero, Opinión del Tribunal de 30 de junio de 1993, ____D.P.R.__ (1993),; El Vocero v. E.L.A., Opinión del

---

[14] El Hon. Juez Antonio Negrón García, juez ponente, citó con aprobación de B.J. Chamberlin y C.J. Brown, *The First Amendment Reconsidered*, New York, 1982, a la pág. 110.

Tribunal de 8 de julio de 1992, __D.P.R.__ (1992); Aponte Martínez v. Lugo, 100 D.P.R. 282 (1971).

De los hechos y de la ley se desprende que el Estado ha establecido un trato diferente para varios miembros de la prensa. A través del criterio establecido para definir Prensa General Activa ha otorgado el beneficio de unas tablillas especiales de prensa selectivamente. El hecho de que se trata de un beneficio no conlleva que el análisis que hagamos pueda ser menos riguroso. Los tribunales, ante una alegación de inconstitucionalidad, han rehusado distinguir entre derechos o privilegios. Goldberg v. Kelly, 397 U.S. 254,262 (1970).

Cuando es el Estado quien distingue, ya sea para imponer cargas o beneficios, entre sectores de la prensa o entre miembros de la prensa, hay que examinar las disposiciones impugnadas tanto bajo la cláusula de igual protección de las leyes, como bajo la protección sustantiva del derecho a la libre expresión y prensa garantizado por la Primera Enmienda. Véase a modo ilustrativo Borreca v. Fasi, 369 F. Supp. 906 (D. Haw.1974); Quad-City Community News Serv., Inc. v. Jebens, 334 F. Supp. 8 (S.D. Iowa 1971); Consumers Union of U.S., Inc. v. Periodical Correspondents Ass'n. 365 F. Supp. 18,25 (D.D.C. 1973). Un trato diferencial entre sectores o miembros de la prensa, envuelve tanto la cláusula de igual protección de las leyes como la Primera Enmienda y es particularmente sospechoso. McCoy v. Providence Journal Co., 190 F.2d 760 (1951). La situación ante nos requiere, pues, análisis bajo ambas cláusulas constitucionales, y los parámetros de ambas deben satisfacerse para que la sección de ley impugnada pueda sostenerse.

Un estatuto que de su faz diferencia entre los miembros de un sector particular de la prensa en la imposición de una carga o en la concesión de un beneficio es de por sí sospechoso.[15] Grosjean v.

---

[15] El Tribunal Supremo federal ha tenido la oportunidad de examinar estos postulados en los casos sobre la imposición de impuestos a la prensa. La prensa no está inmune a que el Estado le imponga impuestos sobre uso y ventas, pero la Primera Enmienda impone ciertas restricciones al Estado. La jurisprudencia ha identificado cuatro supuestos que debido a la carga que imponen a la libertad de prensa se presumen

American Press Co., 279 U.S. 233, 251 (1936). El hecho de que no exista un motivo o intención discriminatoria de parte de la Asamblea Legislativa no cura esta sospecha. Para que surja una violación a la Primera Enmienda no es condición indispensable que exista un motivo ilícito. Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue, 460 U.S. 575, 591-592 (1983).

Toda disposición que diferencie entre sectores o miembros de la prensa, ya sea para conceder credenciales, facilitar acceso, conceder beneficios o imponer cargas debe someterse a un escrutinio estricto donde se le exija al Estado demostrar que dicho tratamiento diferencial obedece a un interés apremiante que no puede satifacerse de un modo menos oneroso. Sherril v. Knight, 569 F. 2d 124 (D.C. Cir. 1977); Borreca v. Fasi, 369 F. Supp. 906 (D. Haw. 1974); ABC v. Cuomo, 570 F.2d. 1080 (2d Cir. 1977); Quad-City Community News service; Inc. v. Jebens, 334 F. Supp. 8 (S.D. Iowa 1971).

Es necesario proteger a la prensa de un trato diferenciador y selectivo por parte del Estado ya que muchas veces es el resultado de un intento indirecto para controlar ciertas publicaciones y su contenido. Al amparo de la Primera Enmienda, aun en casos en que no se ha establecido un propósito discriminatorio, los tribunales han reconocido el peligro que representa la posibilidad de que a través de establecer un trato selectivo entre miembros de la prensa, el Estado señale a aquellos sectores de la prensa que cuestionan el funcionamiento gubernamental o asumen posiciones de oposición. ABC v. Cuomo, *supra* a la pág. 1083.

---

inconstitucionales: cuando el esquema contributivo responde a un propósito legislativo ilícito; cuando se trata de un impuesto que se impone sólo a la prensa; cuando se trata de un impuesto que se impone a base del contenido de la publicación; y cuando se trata de un esquema selectivo donde se señala para trato diferencial a algunos miembros de un sector de la prensa. Grosjean v. American Press, 297 U.S. 233 (1936), Minneapolis Star Tribune Co. v. Minnesota Comm'r of Revenue, 460 U.S. 575 (1983); Arkansas Writers' Project,Inc. v. Ragland, 481 U.S. 221 (1987), Leathers v. Medlock, 499 U.S.__, 111 S Ct. 1438 (1991).
    Se considera que un esquema contributivo impone una carga sustancial a la prensa cuando se señala a la prensa para un trato diferente o cuando se señalan para trato diferencial a algunos miembros en particular de un determinado sector de prensa. Minneapolis Star, *supra* a las págs. 583-591
Un esquema de impuestos no puede aplicarse de modo selectivo a diferentes miembros de un mismo sector de la prensa. Arkansas Writers *supra* a la pág 234.

Conceder a ciertos miembros de la prensa un tratamiento favorable sobre otros medios de la prensa también representa un precedente peligroso:

> The danger in granting favorable treatment to certain members of the media is obvious: it allows the government to influence the type of substantive media coverage that public events will receive. Such a practice is unquestionably at odds with the First Amendment. Anderson v. Cryovac, Inc., 805 F.2d 1,9 (1st. Cir. 1986).

Corresponde pues a este Tribunal analizar si el criterio escogido por la Asamblea Legislativa para definir Prensa General Activa y para excluir a un sector de la prensa del beneficio particular de unas tablillas especiales de prensa, el cual indudablemente hace más cómoda y facilita su labor de recopilar información, puede de facto incidir en el tipo de publicación que queda excluida de dicho beneficio.

Diferimos de la apreciación que hace la mayoría de que el criterio escogido no guarda relación con el tamaño o poder de la empresa periodística, y de que la negativa de una certificación de prensa a Padilla Piña no le impide ni restringe su libertad de prensa ya que su único efecto es el no concederle el beneficio de la tablilla especial de prensa, lo cual no afecta la publicación del periódico y el acceso a información a publicarse. Diferimos también de su conclusión de que el criterio utilizado para diferenciar entre los varios miembros de la prensa no representa el peligro de suprimir determinada idea o expresión, por lo cual no se infrige el derecho a la libertad de prensa de los miembros de la prensa excluidos del beneficio.

Es ingenuo pensar que las empresas periodísticas pequeñas o incipientes, o aquellas de baja circulación, o que aunque publican regularmente sólo publican varias ediciones al año, tengan suficientes recursos económicos para pagar a sus empleados un salario adecuado que permita que el trabajo que realizan para esa empresa periodística **sea su medio principal de vida. Por necesidad, el criterio adoptado excluye del beneficio particular de las tablillas especiales de prensa, a todo**

**un sector particular de la prensa: las empresas periodísticas con pocos recursos económicos.**

Debe ser motivo de honda preocupación el criterio económico seleccionado por la Asamblea Legislativa para definir Prensa General Activa por la existencia de una correlación entre el poder y los recursos económicos de una empresa periodística y el contenido y punto de vista presentado por las mismas. Como regla general, los periódicos que representan posiciones de minoría o de vanguardia, no gozan de mucha circulación, ni cuentan con suficientes recursos económicos. Al otorgar el beneficio de las tablillas especiales de prensa a base de un criterio económico, existe la posibilidad real de estar excluyendo del mismo a todo un sector de la prensa que representa posiciones y puntos de vista que no gozan del endoso de la mayoría.

No hay duda, y así lo reconoce la Opinión de este Tribunal, que las tablillas especiales de prensa facilitan la labor del periodista en la recopilación de información. El disfrutar de unos estacionamientos reservados le hace más cómodo el acceso a aquellos lugares a donde debe acudir en búsqueda de la noticia que ha de publicar. Al escoger el criterio de que el miembro de la prensa se dedique diariamente a la búsqueda de información y de que éste sea su medio principal de vida la Asamblea Legislativa quiso beneficiar y favorecer al periodista que se dedica diariamente a la búsqueda de información como medio principal de vida. La Opinión de este Tribunal considera que éste es un fin legítimo y encomiable, y que por lo tanto este trato particular a un sector de la prensa no ofende la libertad de prensa.

Sin embargo, cabe señalarse, que el derecho a la libertad de expresión y prensa impone limitaciones sustanciales a la actuación gubernamental aun cuando la misma persiga un fin legítimo y encomiable:

> ...the First Amendment as we understand it today rests on the premise that it is government power, rather than private power, that is the main threat to free expression; and as a consequence, the amendment imposes substantial limitations on the Government even when it is trying to serve concededly praiseworthy goals. <u>Turner</u>

<u>Broadcasting Sys., Inc. v. F.C.C.</u>, 114 S. Ct. 2445, 2469 (1994), opinión disidente de la Juez O'Connor

Aun en caso de que la mayoría de este Tribunal no estuviese de acuerdo con nuestra conclusión de que hay una correlación entre el criterio económico utilizado por la Asamblea Legislativa para otorgar el beneficio de las tablillas especiales de prensa y el tamaño, poder y contenido de la prensa, debemos señalar que la Opinión de este Tribunal expresamente reconoce la posibilidad de que las disposiciones impugnadas tengan un efecto incidental en la libertad de prensa. <u>Disidente Universal v. Departamento de Estado</u>, Opinión del Tribunal de 12 de junio de 1998 a las págs. 14 y 15. Reconocida esta posibilidad, correspondía examinar dichas disposiciones bajo un criterio más estricto.

Para que pueda sostenerse una disposición que de algún modo supone una restricción incidental de uno de los  derechos de expresión y prensa garantizados por nuestra Constitución y por la Primera Enmienda de la Constitución de los Estados Unidos, es necesario que dicha disposición responda a un interés gubernamental sustancial y la restricción no puede ser mayor que lo necesario para adelantar dicho interés sustancial. Este escrutinio intermedio es el que se utiliza, al amparo de la Primera Enmienda, para restricciones neutrales en su contenido, pero que imponen una carga incidental en alguno de los derechos garantizados por la libertad de expresión y prensa. Rotunda and Nowak, *Treatise on Constitutional Law,* Vol. 4 sec. 20.18 (Supp. 1998); <u>Turner Broadcasting System Inc. v. FCC,</u> 512 U.S. 622,661 (1994); <u>Turner Broadcast System Inc. v. FCC</u>, 520 U.S. __, 117 S.Ct. 1174 (1997) <u>Forcade v. Knight,</u> 416 F. Supp. 1025, 1035.

El Tribunal Supremo de los Estados Unidos ha reconocido que cuando de las alegaciones surgen planteamientos válidos que implican la Primera Enmienda, las disposiciones impugnadas no se salvan sólo porque satisfagan el criterio de racionalidad. La carga que debe satisfacer el gobierno, una vez implicada la Primera Enmienda es mayor. <u>City of Los</u>

Angeles v. Preferred Communications,Inc., 476 U.S. 488 (1986). Es inapropiado revisar bajo el escrutinio racional de la cláusula de igual protección de las leyes una clasificación impuesta por la Asamblea Legislativa que afecta conducta protegida bajo la Primera Enmienda. Police Department of Chicago V. Mosley, 408 U.S. 92, 98-99, 102 (1972).

V

Nos sentimos con el deber de levantar una última preocupación. Uno de los interrogantes que surge de los hechos planteados ante nos es a quién debe corresponder la facultad de definir lo que es "prensa".[16] La labor no es sencilla y el otorgar esta facultad al sector equivocado puede tener efectos nefastos.

Hemos reconocido que:

> La prensa constituye un vehículo de información y opinión [para] informar y educar al público, ofrecer críticas, proveer un foro para la discusión y el debate, y actuar como un sustituto para obtener noticias e información para sus lectores, que por sí y como individuos no pueden o desean compilarla. Si consideramos que la función de la prensa incluye el revisar y evaluar la labor gubernamental para informar de ello al público, es forzoso concluir que debe de mantenerse a la prensa fuera del control gubernamental. Solo así podrá llevar a cabo su función fiscalizadora adecuadamente. Santiago v. Bobb y el Mundo, 117 D.P.R. 153,159 (1986)

La independencia de la prensa es crucial para nuestro sistema de gobierno. Una prensa independiente es una prensa en la cual la regulación del Estado está confinada a un mínimo. Esto incluye regulaciones tanto para establecer requisitos o cargas como para otorgar beneficios. Mientras mayor injerencia se dé al organismo gubernamental en los asuntos de la prensa mayor será el control del Estado sobre la misma.

---

[16] La tarea no es fácil, ni existe un consenso al respecto. Algunas posiciones enfatizan la prensa como institución, mientras que otras se enfocan en la función de la prensa. *Véase,* Melville B. Nimmer, *Is Freedom of the Press a Redundancy: What Does it Add To Freedom of Speech?* 26 Hastings Law Journal 639(1975), David Lange*, The Speech and Press Clauses*, 23 UCLA L. Rev. 57 (1975).

Sin embargo encontramos que a nivel estatal los estados se han visto obligados a definir "prensa" en algunos supuestos. Entre estos se encuentran aquellos estatutos que confieren un privilegio estatutario a los periodistas de no tener que revelar sus fuentes; la definición de prensa en los estatutos que regulan acceso a las prisiones; y los estatutos que imponen impuestos o que otorgan exenciones contributivas a la prensa.

Como parte de nuestro análisis del Reglamento 5285, examinamos reglamentos anteriores del Departamento de Estado que regían la expedición y regulación de credenciales de prensa. El Reglamento 3879 del Departamento de Estado, vigente del 7 de febrero de 1989 al 27 de noviembre de 1992, definía en su artículo II(B) las credenciales de prensa como la identificación que acredita que su poseedor es un periodista activo en Puerto Rico y certificado por la empresa para cual trabaja. Para ser considerado periodista bastaba que el solicitante se desempeñase en sus labores para dicha empresa en forma directa y consistente y que dicha empresa certificase la prestación de dichos servicios. Art. II(A), Reglamento 3879 del Departamento de Estado.

Dicho Reglamento, al igual que el Reglamento 5285 que ya examinamos, adolecía del defecto de carecer de autoridad para regular la expedición de credenciales de prensa ya que su única base legal era la Sección 3.1 del Capítulo III de la Ley de Procedimiento Administrativo Uniforme que regula los derechos a salvaguardarse en los procedimientos adjudicativos formales en las agencias. Sin embargo, cabe resaltar, que bajo el Reglamento 3879, la otorgación de la credencial de prensa al periodista, dependía exclusivamente de una certificación a cargo de la propia empresa para la cual laboraba. Es decir, en última instancia, correspondía a la propia empresa periodística determinar, a base de la labor realizada por sus empleados, a quien debía concedérsele una credencial de prensa. Por considerar que con este criterio se limita la intervención gubernamental a un mínimo, refrendamos dicha definición.

VI

Examinados los autos y el derecho aplicable hemos llegado a la conclusión de que el Reglamento 5285 del Departamento de Estado que Regula la Expedición, Renovación, Cancelación, Uso y Responsabilidades de las Certificaciones de Prensa es nulo por excederse de la autoridad concedida por sus leyes habilitadoras. Consideramos además, que la Opinión de este Tribunal aplica a la sección 2-408(e) de la Ley 141 el

criterio de nexo racional o mínimo sin examinar ni contestar las preguntas que necesariamente surgen cuando de modo directo o incidental está involucrado el derecho a la libertad de prensa.

Al ignorar esta normativa constitucional el Tribunal Supremo establece un precedente peligroso en lo que respecta a la libertad de prensa en Puerto Rico. Más aun cuando esto conlleva permitir que el Departamento de Estado se abrogue el poder de emitir credenciales de prensa y así determine quien puede cubrir los eventos públicos.

En unos momentos en que ciertos medios de comunicación sostienen ante los tribunales y ante la opinión pública que el Estado está discriminando contra ellos en la colocación de anuncios gubernamentales como represalia por sus reportajes periodísticos, es realmente sorprendente y lamentable que una mayoría de este Tribunal permita que el Estado se abrogue el poder de discriminar entre periodistas.

Por todo lo anterior nos vemos obligados a disentir.


FEDERICO HERNÁNDEZ DENTON
Juez Asociado